# Illinois Official Reports

## Appellate Court

***Adcock v. Illinois Workers' Compensation Comm'n*, 2015 IL App (2d) 130884WC**

| | |
|---|---|
| Appellate Court Caption | DAVID ADCOCK, Appellant, v. THE ILLINOIS WORKERS' COMPENSATION COMMISSION *et al.* (Knaak Manufacturing, Appellee). |
| District & No. | Second District<br>Docket No. 2-13-0884WC |
| Filed | August 14, 2015 |
| Decision Under Review | Appeal from the Circuit Court of McHenry County, No. 12-MR-527; the Hon. Thomas A. Meyer, Judge, presiding. |
| Judgment | Reversed; cause remanded. |
| Counsel on Appeal | Francisco J. Botto and Alex C. Wimmer, both of Botto Gilbert Gehris Lancaster, P.C., of Crystal Lake, for appellant.<br><br>Marc J. Cairo, of Garofalo, Schreiber & Storm, Chtrd., of Chicago, for appellee. |
| Panel | PRESIDING JUSTICE HOLDRIDGE delivered the judgment of the court, with opinion.<br>Justices Hoffman and Hudson concurred in the judgment and opinion.<br>Justice Stewart specially concurred, with opinion, joined by Justice Harris. |

**OPINION**

¶ 1    The claimant, David Adcock, sustained an injury to his left knee when he was working as a welder for the employer, Knaak Manufacturing. The claimant sought benefits under the Illinois Workers' Compensation Act (Act) (820 ILCS 305/1 *et seq.* (West 2010)). The employer disputed the claimant's assertion that he sustained an accident that "arose out of" his employment. The arbitrator found in favor of the claimant. The employer appealed the arbitrator's decision to the Illinois Workers' Compensation Commission (Commission). The Commission reversed the arbitrator and found that the claimant failed to prove that he sustained a workplace accident that arose out of his employment. The claimant appealed to the circuit court, which held that the Commission's decision was not against the manifest weight of the evidence. This appeal followed.

¶ 2                                         BACKGROUND

¶ 3    The claimant testified that, on May 10, 2010, he sat on a rolling chair that the employer provided in order to accommodate a condition of ill-being in his right knee while performing work-related tasks. He had worked in a seated capacity since May 2007. The chair that the employer provided had wheels, and the claimant sat on the chair as he welded lock systems. At the time of the accident, the claimant used his left leg to turn his stool in an attempt to turn to his right in order to perform a welding task. He was not pushing the stool, but instead, he rotated his left knee inward and turned his body to weld. When he turned, his left knee popped. At that time, he experienced immediate pain and a burning sensation in his left knee. He reported the accident to his supervisor immediately after it happened. The claimant put ice on his knee and attempted to continue working for the next three days. He then went on a three day vacation. When the claimant's symptoms did not subside thereafter, he sought treatment at an occupational health clinic on May 18, 2010.

¶ 4    At the clinic, the claimant reported that he injured his left knee when he internally rotated his left leg and left knee when he turned to weld to his right while sitting on a chair with wheels. He reported that he felt a pop and a burning sensation laterally into his patella. For the remainder of the day, he used his arms to move his chair around his work station and stayed stationary to perform welding tasks. The claimant stated that, prior to the accident, he had been working under permanent restrictions due to conditions of ill-being in his right knee. Because of these right knee conditions, the claimant was unable to twist, kneel, or walk extensively. At the clinic, Dr. Alexander Jablonowski examined the claimant and diagnosed him as having a left knee sprain. Dr. Jablonowski placed the claimant on light duty work restrictions. Thereafter, the claimant continued to follow up with Dr. Jablonowski and worked light duty.

¶ 5    On May 28, 2010, the claimant had a follow up visit with Dr. Jablonowski. The doctor believed that the claimant's left knee sprain had worsened and ordered an MRI. The MRI showed "[f]indings suspicious for vertical tear of the medial meniscus" and "[p]artially

discoid lateral meniscus." Dr. Jablonowski referred the claimant to Dr. Steven Rochell, an orthopedic surgeon.

¶ 6 The claimant saw Dr. Rochell on June 16, 2010, and the doctor diagnosed the claimant as having a probable medial meniscus tear as a result of his work history. The doctor ultimately recommended arthroscopic surgery and took the claimant off work on July 12, 2010.

¶ 7 On August 10, 2010, the claimant was examined by Dr. Preston Wolin, the employer's independent medical examiner (IME). Dr. Wolin testified at the arbitration hearing by way of an evidence deposition, and his IME report was admitted into evidence.

¶ 8 In his IME report, Dr. Wolin stated that he viewed a video that depicted the claimant's job duties. He opined: "I do not believe that the activities depicted in the video of [*sic*] sufficient loading and torque to cause a medial meniscus tear." Dr. Wolin wrote in his report that he did not believe that "the mechanics or environment in which the [claimant] was working [were] sufficient to cause or aggravate a tear." He believed that the claimant's "partially discoid lateral meniscus is a congenital condition" and was not contributing to his symptoms. At the time of his report (August 10, 2010), Dr. Wolin was "somewhat concerned" about the proposed surgery and did not believe that it would improve the claimant's symptoms. He believed that the claimant's meniscal pathology was more than likely unrelated to "the work episode of 05/10/10."

¶ 9 On September 30, 2010, the claimant underwent a left knee arthroscopy as well as medial and lateral meniscectomies performed by Dr. Rochell. The claimant then underwent a course of physical therapy and continued to treat with Dr. Rochell until January 5, 2011, when he was released from Dr. Rochell's care and for full duty with respect to the left knee. During the arbitration hearing, the claimant testified that, although he was released to full duty, he occasionally experiences stiffness and soreness in his left knee when standing or walking for prolonged periods or when attempting to squat or kneel.

¶ 10 Dr. Wolin's evidence deposition was taken after the claimant's arthroscopic surgery. During his deposition, Dr. Wolin testified that the claimant had a body mass index of 53.3 and opined that the claimant's weight caused an increased load across the meniscal cartilage of both knees. Dr. Wolin again opined that he did not believe that the job duties demonstrated in the video depicted sufficient loading or torque to cause a medial meniscus tear. He testified that "pushing off of one foot and using a sliding chair to move from the right to the left" was not "enough of an energy to produce a meniscus tear." Dr. Wolin further opined that a lateral meniscus tear was not possible with an internal rotation of the knee because of the "screw hole mechanism of the knee." He explained that with internal rotation, if there is torque, it is going to be applied to the lateral meniscus, not the medial meniscus.

¶ 11 Dr. Wolin testified that the claimant told him that the employer's job video accurately reflected his workstation. However, Dr. Wolin acknowledged that the job video depicted an employee other than the claimant and did not appear to demonstrate the employee planting his left foot and pivoting, which was the mechanism of injury that the claimant had described to Dr. Wolin. Moreover, Dr. Wolin admitted that he did not know the condition of the concrete floor upon which the claimant rolled his chair or how much force was required to push the chair across the floor. Nor did Dr. Wolin know the condition of the chair itself or the condition of its wheels.

¶ 12 At the time of the evidence deposition, Dr. Wolin was unaware that the claimant had undergone arthroscopic surgery on his left knee. After reviewing Dr. Rochell's postoperative

findings, Dr. Wolin agreed that the claimant's complaints of medial and lateral left knee pain and the MRI films of the claimant's left knee were consistent with Dr. Rochell's postoperative diagnosis.

¶ 13    The claimant testified that his work duties required him to weld approximately 70 locks during one workday, which required more rapid movements than were depicted in the employer's job duties video. He stated that his job required nonstop movement in the chair, including moving back and forth along the length of the workstation and swiveling from one point to another. He also testified that the cement floor upon which his chair rolled was cracked, uneven, and littered with metal pieces from welding, which made it difficult to maneuver across the floor's surface. Moreover, the claimant stated that, due to his previous right knee injury, he was unable to push off with his right leg. Accordingly, the claimant used his left leg to turn the chair from side to side or when moving the chair itself.

¶ 14    Although the claimant agreed that the video viewed by Dr. Wolin showed the claimant's workstation, he testified that the person welding in the video did not perform the work duties in the same fashion that the claimant did. The welder in the video did not demonstrate how he used his left leg to maneuver the chair. Moreover, according to the claimant, the welder's pace in the video was slower that what the claimant was required to perform. However, the employer's witness, Benjamin Fisher, testified that, based upon the employer's production logs, the claimant repeatedly missed his production quotas and actually performed his job more slowly than the welder depicted in the video.

¶ 15    Dr. Rochell also testified at the arbitration hearing by way of an evidence deposition. Dr. Rochell stated that he had treated the claimant's right knee condition in 2006 and 2007 and had released him from his care with permanent work restrictions of seated work as indicated by a functional capacity evaluation (FCE) dated May 27, 2007.

¶ 16    With respect to the claimant's left knee, Dr. Rochell testified that the claimant reported that he injured his left knee while he was seated at his job and performing a twisting and turning action in order to weld at his workstation. Dr. Rochell opined that this twisting and turning caused the injury to the claimant's left knee which resulted in the tear of the medial and lateral menisci. During cross-examination, Dr. Rochell testified that a similar injury could have occurred while the claimant exited his car or got up from a table. Dr. Rochell was not aware of anything specific in the claimant's workplace that increased the risk of a left knee injury.

¶ 17    The arbitrator found that the claimant sustained an accidental injury that arose out of and in the course of his employment. In support of this finding, the arbitrator stated:

    "[The claimant] presented detailed testimony regarding his work station, including the rough and uneven surface of the concrete floor upon which his stool must roll, the debris that was routinely covering the floor, the insufficiency of the wheels on the stool and the mechanism by which he was required to move himself about on the stool. Conducting welding duties from a rolling stool would simply _not_ be a risk to which the general public would likewise be exposed. Furthermore, it is clear that [the employer]'s exhibits detailing [the claimant]'s daily production quotas were irrelevant and should be given no weight, as they are not at all indicative of the mechanism of injury. Accordingly, the Arbitrator finds that [the claimant] met the burden of proving that the injury arose out of [the claimants] employment with [the

employer], that his job duties went beyond normal daily activities and that the risk to which he was exposed was beyond that of the general public." (Emphasis in original.)

¶ 18    The arbitrator awarded the claimant medical expenses, temporary total disability benefits, and permanent partial disability (PPD) benefits to the extent of "a 20% loss of use of his left leg, or 43 weeks of PPD at the rate of $464.64 per week."

¶ 19    The employer appealed the arbitrator's decision to the Commission. The Commission disagreed with the arbitrator's analysis with respect to whether the claimant sustained an accident that "arose out of" his employment and concluded that the claimant failed to sustain his burden on this issue. The Commission, therefore, denied the claim and did not address the issues the employer raised regarding the compensation awarded to the claimant.

¶ 20    In evaluating the "arising out of the employment" element, the Commission stated as follows:

"The evidence establishes that the [claimant] did sustain a left knee injury. The [claimant] testified that he was sitting on his swivel chair and turning when he felt a pop in his knee. The [claimant] testified specifically that at the time of his injury, he was not pushing his chair, rather he was turning his body. Furthermore, Dr. Rochell testified that there was nothing specific at [the claimant]'s workplace that increased the risk to a left knee injury as it could have happened anywhere.

The act of turning, even in a chair, is an activity of everyday life and does not constitute a compensable injury under the Illinois Workers' Compensation Act. ***

The Commission finds no evidence that the injury was caused by an increased risk connected with the [claimant]'s work duties, or a defect in the chair or floor. The [claimant]'s act of turning in his swivel chair did not expose him to a greater risk than that to which the general public is exposed, and it was not a risk distinctive to his employment."

¶ 21    The Commission, therefore, concluded that the claimant failed to carry his burden of proving "that his injury arose out of and in the course of his employment."

¶ 22    The claimant appealed the Commission's decision to the circuit court, which confirmed the Commission's decision. In so ruling, the circuit court noted:

"[T]he Commission received evidence from Dr. Rochell that the injury could have happened anywhere and that he was not aware of anything that increased the [claimant]'s risk of a knee injury. Dr. Wolin testified that the mechanics of the [claimant]'s work were insufficient to cause the injury in question.

Ultimately, the Commission found that there was no evidence that the [claimant]'s injury was caused by an increased risk connected to the [claimant]'s work duties. This finding was supported by the testimony of Dr. Rochell and Dr. Wolin above. The Commission's finding that the act of turning in a chair is an activity of everyday life was also supported by the testimony of Drs. Wolin and Rochell. As a result, there was competent evidence supporting the decision by the Commission that the [claimant]'s act of turning his swivel chair did not expose him to a greater risk than that faced by the general public and was not a risk unique to his employment."

¶ 23    The claimant now appeals the circuit court's judgment.

¶ 25     In order to recover benefits under the Act, a claimant bears the burden of proving by a preponderance of the evidence that his injury "ar[ose] out of" and "in the course of" his employment. 820 ILCS 305/2 (West 2010). Both elements must be present to justify compensation. *First Cash Financial Services v. Industrial Comm'n*, 367 Ill. App. 3d 102, 105 (2006).

¶ 26     The "in the course of employment" element refers to the time, place, and circumstances surrounding the injury. *Sisbro, Inc. v. Industrial Comm'n*, 207 Ill. 2d 193, 203 (2003). "That is to say, for an injury to be compensable, it generally must occur within the time and space boundaries of the employment." *Id.*

¶ 27     The requirement that the injury arise out of the employment concerns the origin or cause of the claimant's injury. *Id*. The occurrence of an accident at the claimant's workplace does not automatically establish that the injury "arose out of" the claimant's employment. *Parro v. Industrial Comm'n*, 167 Ill. 2d 385, 393 (1995). "The 'arising out of' component is primarily concerned with causal connection" and is satisfied when the claimant has "shown that the injury had its origin in some risk connected with, or incidental to, the employment so as to create a causal connection between the employment and the accidental injury." *Sisbro, Inc.*, 207 Ill. 2d at 203.

¶ 28     In the present case, the parties do not dispute that the claimant's injury occurred "in the course" of his employment. The disputed issue in this appeal concerns the "arising out of" element of a workers' compensation claim.

¶ 29     Whether an injury arose out of and in the course of a claimant's employment is a question of fact to be resolved by the Commission, and its determination will not be disturbed on review unless it is against the manifest weight of the evidence. *Illinois Institute of Technology Research Institute v. Industrial Comm'n*, 314 Ill. App. 3d 149, 164 (2000). For a finding of fact to be against the manifest weight of the evidence, a conclusion opposite to the one reached by the Commission must be clearly apparent. *Caterpillar, Inc. v. Industrial Comm'n*, 228 Ill. App. 3d 288, 291 (1992). Although we are reluctant to disturb a factual determination made by the Commission, we will not hesitate to do so when the clearly evident, plain, and undisputable weight of the evidence compels an opposite conclusion. *Dye v. Illinois Workers' Compensation Comm'n*, 2012 IL App (3d) 110907WC, ¶ 10.

¶ 30     In the present case, the Commission made certain factual findings that are not disputed by the parties in their briefs. Those factual findings include a finding that the claimant sustained a left knee injury when he turned in his chair to perform a welding task. Although Dr. Wolin opined that the internal rotation movement was insufficient to cause the meniscal damage, the Commission, nonetheless, disagreed and found that the claimant did sustain a left knee injury at the time and in the manner in which he testified. The parties disputed the mechanism of the claimant's injury in the proceeding before the Commission, but neither party has argued that the Commission's finding that the claimant injured his left knee when he turned to weld is against the manifest weight of the evidence.

¶ 31     After determining the mechanism of the claimant's injury, the Commission's first task in determining whether the injury arose out of the claimant's employment is to categorize the risk to which the claimant was exposed in light of its factual findings relevant to the mechanism of the injury. *First Cash Financial Services*, 367 Ill. App. 3d at 105. There are three types of risks to which employees may be exposed: (1) risks that are distinctly

associated with employment; (2) risks that are personal to the employee, such as idiopathic falls; and (3) neutral risks that do not have any particular employment or personal characteristics. *Potenzo v. Illinois Workers' Compensation Comm'n*, 378 Ill. App. 3d 113, 116 (2007); *Homerding v. Industrial Comm'n*, 327 Ill. App. 3d 1050, 1056 (2002).

¶ 32    With respect to the third category, "[i]njuries resulting from a neutral risk generally do not arise out of the employment and are compensable under the Act only where the employee was exposed to the risk to a greater degree than the general public." *Springfield Urban League v. Illinois Workers' Compensation Comm'n*, 2013 IL App (4th) 120219WC, ¶ 27. The increased risk may be either qualitative (*i.e.*, when some aspect of the employment contributes to the risk) or quantitative (such as when the employee is exposed to the risk more frequently than members of the general public by virtue of his employment). *Metropolitan Water Reclamation District of Greater Chicago v. Illinois Workers' Compensation Comm'n*, 407 Ill. App. 3d 1010, 1014 (2011).

¶ 33    In this case, the claimant was injured while turning in his chair, which is an activity of everyday life. There is no evidence that his injury was caused by a risk personal to the employee, such as an idiopathic fall. Moreover, the risk of injury that the claimant confronted was not "distinctly associated" with the claimant's employment; rather, it was a neutral risk of everyday living faced by all members of the general public. Thus, as the Commission noted, the claimant's injury is compensable only if the claimant was exposed to this risk to a greater degree than the general public. *Springfield Urban League*, 2013 IL App (4th) 120219WC, ¶ 27.

¶ 34    The claimant made that showing here. The claimant's work duties required him to weld approximately 70 locks during one workday. Since May 2007, the claimant had to perform his welding duties from a seated position, using a chair with wheels to maneuver as a result of a separate condition in his right knee. To perform his welding duties, the claimant had to move and turn in his chair repeatedly. The claimant testified that his job required "non-stop" movement in the chair, including "swiveling." The employer does not dispute this testimony. Moreover, the claimant performed his job duties under time constraints. Although the parties dispute how fast the claimant actually worked in comparison to the welder depicted in the "job duties" video, there is no question that the claimant's job involved time pressure. Thus, under a neutral risk analysis, the claimant's injury arose out of his employment because he was exposed to the risks inherent in an everyday activity (turning in a chair) to a greater degree than the general public by virtue of his employment. See *Illinois Institute of Technology Research Institute*, 314 Ill. App. 3d at 163-64; see also *Springfield Urban League*, 2013 IL App (4th) 120219WC, ¶ 27; *Nascote Industries v. Industrial Comm'n*, 353 Ill. App. 3d 1056, 1061 (2004). The claimant's job required him to turn in a chair more frequently than members of the general public while under time constraints, which increased the risk of injury both quantitatively and qualitatively. The Commission's finding that the claimant's injury did not "arise out of" his employment was therefore against the manifest weight of the evidence.

¶ 35    The employer cites *Board of Trustees of the University of Illinois v. Industrial Comm'n*, 44 Ill. 2d 207 (1969), in support of its argument that the Commission's decision should be affirmed. In that case, the employee was a teaching assistant who was working at a desk preparing examination questions. He heard a noise, turned in his chair, and felt a " 'snap' " in his back. *Id*. at 208-09. The claimant then underwent a course of medical treatments for

- 7 -

conditions of ill-being in his back. The Commission found that the employee's injury arose out of his employment, but the supreme court held that this finding was against the manifest weight of the evidence. *Id*. at 214. The supreme court reasoned as follows: "The appellant simply turned in his chair and suffered the injury. There was no suggestion that the chair was defective or unusual in any way. The medical evidence was that because of its degenerated condition any simple and normal activity would have caused the appellant's disc to rupture. The injury was not caused by a risk incidental to the employment." *Id*. at 214-15.

¶ 36    *Board of Trustees* is distinguishable from the present case. The claimant in *Board of Trustees* suffered a ruptured disc when he turned in his chair in response to a noise. There was no evidence that the claimant's job duties required him to turn in a chair on a regular basis, *i.e.*, more frequently than members of the general public. Here, by contrast, it is undisputed that the claimant's job required him to move and turn in his chair continually. Thus, unlike claimant in *Board of Trustees*, the claimant in this case confronted a neutral risk of daily living to a greater degree than members of the general public by virtue of his employment.[1] Under such circumstances, a finding that the injury did not arise out of the employment is against the manifest weight of the evidence.

¶ 37    The special concurrence takes issue with our analysis. Specifically, the special concurrence maintains that, if an employee is injured while "performing a common bodily movement that is required by his job duties" (*infra* ¶ 57), then the injury "arose out of" his employment, even if the physical action that caused the injury is something that virtually everyone does on a daily basis (such as walking or turning while sitting in a chair). For the special concurrence, all that matters is that the physical action is required by the employee's job duties; if so, then the risk posed by the activity is assumed to be connected to the claimant's employment, and would be "improper *** to engage in a neutral-risk analysis." *Infra* ¶ 63.

¶ 38    We disagree. "The purpose of the Illinois Workers' Compensation Act is to protect the employee against risks and hazards which are *peculiar to the nature of the work he is employed to do.*" (Emphasis added.) *Orsini v. Industrial Comm'n*, 117 Ill. 2d 38, 44 (1987). Accordingly, "[f]or an injury to have arisen out of the employment, the risk of injury must be a risk peculiar to the work or a risk to which the employee is exposed to a greater degree than the general public by reason of his employment." *Id.* at 45; see also *Karastamatis v. Industrial Comm'n*, 306 Ill. App. 3d 206, 209 (1999) (ruling that "in order for an injury to arise out of one's employment, the risk must be: (1) a risk to which the public is generally not exposed but that is peculiar to the employee's work, or (2) a risk to which the general public is exposed but the employee is exposed to a greater degree"). If neither of these factors apply, *i.e.*, if the injury is caused by an activity of daily life to which all members of the public are equally exposed (or by a risk personal to the employee), then there can be no recovery under the Act, even if the employee was required to perform that activity by virtue of his employment. See, *e.g.*, *Hopkins v. Industrial Comm'n*, 196 Ill. App. 3d 347, 348-52

---

[1]Moreover, the act that caused the claimant's injury in *Board of Trustees* (turning in his chair) was not incidental to his employment, and there was medical evidence suggesting that the injury was caused by a personal risk because, prior to the accident, the condition of the claimant's back had degenerated to such an extent that "any simple and normal activity would have caused the appellant's disc to rupture." *Board of Trustees*, 44 Ill. 2d at 215.

(1990) (holding that claimant's back injury, which the claimant suffered at work while turning in his chair to answer a question posed by another employee the claimant was training, did not arise out of the claimant's employment, even though the employer required the claimant to train the other employee). In such cases, the risk leading to the injury is not "connected with" or "incidental to" the employment; rather, it is merely a personal risk or a risk of everyday living. See, *e.g.*, *id.* at 352.

¶ 39    In support if its analysis, the special concurrence cites *Caterpillar Tractor Co. v. Industrial Comm'n*, 129 Ill. 2d 52, 58 (1989). *Infra* ¶¶ 51-52. In that case, our supreme court ruled that "*[t]ypically,* an injury arises out of one's employment if, at the time of the occurrence, the employee was performing acts he was instructed to perform by his employer, acts which he had a common law or statutory duty to perform, or acts which the employee might reasonably be expected to perform incident to his assigned duties." (Emphasis added.) *Caterpillar Tractor Co.*, 129 Ill. 2d at 58. Although we agree that injuries caused by such acts "typically" arise out of the employment, we do not join the special concurrence's conclusion that this is *always* the case. The Commission should not award benefits for injuries caused by everyday activities like walking, bending, or turning, even if an employee was ordered or instructed to perform those activities as part of his job duties, unless the employee's job required him to perform those activities more frequently than members of the general public or in a manner that increased the risk. In other words, a "neutral risk" analysis should govern such claims.

¶ 40    We have applied a neutral risk analysis to these types of claims in several prior decisions. For example, in *Kemp v. Industrial Comm'n*, 264 Ill. App. 3d 1108 (1994), the claimant was injured at a construction site while squatting down to read an air gauge which was 10 to 15 inches off the ground. The claimant was required to perform this task as part of his job duties. *Id.* at 1111. Nevertheless, we analyzed the claimant's claim under neutral risk principles. We affirmed the Commission's award of benefits because we found that the type of bending and squatting required by the claimant's job "differ[ed] both in type and frequency from the type of bending and stooping in which the average member of the general public could be expected to ordinarily engage." *Id*. We found the claimant's injury compensable because it was "the result of being exposed to a risk to a greater degree than the general public." *Id.*

¶ 41    Similarly, in *Komatsu Dresser Co. v. Industrial Comm'n*, 235 Ill. App. 3d 779 (1992), the claimant's job required him to lift parts weighing between 30 and 40 pounds from a box located next to a machine and place the parts into the machine for processing. The box containing the parts was on a skid, which placed the box waist high and required the claimant to bend from his waist to lift the part out of the box. *Id.* at 780-81. The claimant was injured when he bent over to pick up a part out of the box. *Id.* at 781. In affirming the Commission's award of benefits, we held that "it was a reasonable inference that the claimant's acts of bending required by his work exposed [him] to a greater degree of risk than that of the general public" because witness testimony established that "the claimant's work required him to regularly bend from the waist and lift parts weighing between 15 and 40 pounds out of a box and that the location of the box did not enable the claimant to bend his knees while doing this activity." *Id.* at 788. We noted that "[t]he frequency of this activity and the method in which the claimant had to bend and lift without bending his knees increased the claimant's exposure to risk of injury from the bending than that of the general public, and, thus, the fact

that bending is a normal activity did not preclude a finding that the claimant's injury arose out of his employment." *Id.* We have applied a similar analysis in other cases. See, *e.g.*, *Nabisco Brands, Inc. v. Industrial Comm'n*, 266 Ill. App. 3d 1103, 1107 (1994).[2]

¶ 42    In each of these cases, the claimant was injured while performing bodily movements that were required by his job duties. Nevertheless, we did not stop our analysis there and affirm on that basis alone, as the special concurrence would have us do in this case. Instead, because the bodily movements at issue could arguably be characterized as activities of everyday living (such as bending, stooping, squatting, and walking), we analyzed the claims under neutral risk principles. In each case, we affirmed the award of benefits because we determined that the claimant's employment required him to perform an everyday activity more frequently than members of the general public or in a manner that increased the risk of the activity beyond the risk normally faced by the general public.

¶ 43    The same analysis should govern here. In the special concurrence's view, an injury suffered while performing an activity of everyday living is compensable so long as the activity is required by the employment, even if nothing about the employment increases the risk of the activity beyond that which is faced by members of the general public. In our view, this expansive interpretation of the Act departs from the precedents noted above and threatens to erode the distinction between "arising out of" and "in the course of" the employment.

¶ 44    Thus, we decline to apply the analysis endorsed by the special concurrence. However, because we hold that the claimant has established an entitlement to benefits under neutral risk principles, we agree with the special concurrence that the Commission's decision must be reversed.

¶ 45                                   CONCLUSION

¶ 46    For the foregoing reasons, we reverse the judgment of the circuit court of McHenry County confirming the Commission's decision, vacate the Commission's decision, and remand to the Commission with instructions to determine the compensation to be awarded to the claimant.

¶ 47    Reversed; cause remanded.

¶ 48    JUSTICE STEWART, specially concurring.

¶ 49    I agree with the ultimate disposition reached by my distinguished colleagues in this case. However, I do not agree with the analysis the majority uses in determining whether the

---

[2]As the special concurrence notes, we did not apply a neutral risk analysis in *Young v. Illinois Workers' Compensation Comm'n*, 2014 IL App (4th) 130392WC, or in *Autumn Accolade v. Illinois Workers' Compensation Comm'n*, 2013 IL App (3d) 120588WC. See *infra* ¶¶ 58-63. In fact, those cases suggest that a neutral risk analysis is unnecessary where the employee is injured while performing his or her required work duties. *Young*, 2014 IL App (4th) 130392WC, ¶ 23; *Accolade*, 2013 IL App (3d) 120588WC, ¶ 19. We note that both of those cases would likely have been decided the same way under a neutral risk analysis (*i.e.*, a neutral risk analysis supports our judgment in each case). Nevertheless, to the extent that *Young* and *Accolade* conflict with our analysis in this case, we decline to follow them.

claimant's injuries arose out of his employment. Specifically, the majority concludes that "the risk of injury that the claimant confronted was not 'distinctly associated' with the claimant's employment; rather, it was a neutral risk of everyday living faced by all members of the general public." *Supra* ¶ 33. I disagree. The claimant's risk of injury was distinctly associated with his employment and was not simply a neutral risk. Therefore, the majority analysis improperly saddled the claimant with the burden of proving that he was exposed to the risk of injury "to a greater degree than the general public."

¶ 50    The first step in analyzing whether the claimant's injury arose out of his employment is to determine in which of the three categories his risk fell. The three categories are: (1) risks that are distinctly associated with employment; (2) risks that are personal to the employee, such as idiopathic falls; and (3) neutral risks that do not have any particular employment or personal characteristics. *Baldwin v. Illinois Workers' Compensation Comm'n*, 409 Ill. App. 3d 472, 478 (2011).

¶ 51    With respect to risks that are distinctly associated with employment, the supreme court has stated that an injury arises out of a claimant's employment when he is injured while "performing acts which he was instructed to perform by his employer, acts which he had a common law or statutory duty to perform, or acts which the employee might reasonably be expected to perform incident to his assigned duties." *Caterpillar Tractor Co. v. Industrial Comm'n*, 129 Ill. 2d 52, 58 (1989). "A risk is incidental to the employment where it belongs to or is connected with what an employee has to do in fulfilling his duties." *Id*.

¶ 52    The difference in my analysis and the analysis employed by the majority lies in determining the category of risk which results in a worker's injury. I would first examine the facts to determine if the acts that caused the injury were "connected with what an employee has to do in fulfilling his duties." *Id*. If so, the acts that caused the injury are an employment risk, and the claim is compensable. Thus, the first step in risk analysis should be to determine if the risk is one distinctly associated with the employment. If it is, then it cannot be either a personal risk or a neutral risk.

¶ 53    Paragraph 34 of the majority's decision establishes how the claimant's risk of injury arose directly from acts that his employer instructed him to perform. *Supra* ¶ 34. The majority succinctly describes how the claimant's work duties required him to weld from a seated position, maneuvering in a chair, including swiveling, while under time pressure. These are the acts that resulted in the claimant's injury. Because the claimant proved that he was injured while performing acts he was expected to perform incident to his assigned duties, he proved that his risk of injury fell within the category of risks that are distinctly associated with his employment.

¶ 54    In contrast to the analysis above, the majority first examines the acts that caused the injury to determine if the worker was performing some bodily movement engaged in by the general public. If so, the majority would categorize the risk as a neutral risk and employ a neutral-risk analysis. In doing so, the majority would require the worker to prove that he was exposed to the risk, either qualitatively or quantitatively, to a greater degree than the general public, even though he was injured performing the very tasks required by his employment. In fact, the majority states that "[t]he Commission should not award benefits for injuries caused

by everyday activities like walking,[3] bending, or turning, *even if an employee was ordered or instructed to perform those activities as part of his job duties*, unless the employee's job required him to perform those activities more frequently than members of the general public or in a manner that increased the risk." (Emphasis added.) *Supra* ¶ 39. That statement simply cannot be squared with our courts' long-adopted definition of a "neutral risk" as one with no particular employment characteristics.

¶ 55        Generally, our courts have offered a far more narrow definition of neutral risks. "Neutral risks include stray bullets, dog bites, lunatic attacks, lightning strikes, bombing, and hurricanes." *Illinois Institute of Technology Research Institute v. Industrial Comm'n*, 314 Ill. App. 3d 149, 163 (2000). These examples are true neutral risks because they clearly have no particular employment characteristics.

¶ 56        The problem with the majority's analysis is that many workers are employed for the very purpose of engaging in actions and movements performed by the general public. This method of analysis then leads us, as in this case, to perform a neutral-risk analysis when a worker has been injured performing the very tasks he was hired to perform. If workers' injuries are first examined to determine whether they were reaching, turning, bending, squatting, or engaging in other common bodily movements at the precise moment of injury, virtually all industrial injuries could be categorized as neutral risks.

¶ 57        As a result, in categorizing the risk of injury, we must first view the acts that cause an injury within the context of a worker's employment duties. If a worker is injured performing a common bodily movement that is required by his job duties, the risk of injury is an employment risk. To hold otherwise would greatly expand the number of cases subject to neutral-risk analysis and subject injured workers to a level of proof beyond evidence that they were injured performing their job duties.

¶ 58        I believe that we properly analyzed this issue recently in *Young v. Illinois Workers' Compensation Comm'n*, 2014 IL App (4th) 130392WC, and that the majority's analysis in the present case directly conflicts with our analysis in *Young*. Regrettably, the majority now disavows our unanimous analysis in *Young*.

¶ 59        In *Young*, we addressed the "arising out of" element in a case in which an employee injured his shoulder while simply reaching for an object. The employee's job duties required him to inspect parts that he was required to retrieve from inside a box that was three feet deep. *Id*. ¶ 22. The claimant injured his left shoulder by bending over into the box and reaching down to the bottom to retrieve a spring clip for inspection. *Id*. The claimant felt a " 'pop' " in his left shoulder as he reached for the part. *Id*. With respect to the "arising out of" element of the claim, we noted that "[t]his evidence unequivocally shows claimant was performing acts that the employer might reasonably have expected him to perform so that he could fulfill his assigned duties on the day in question." *Id*.

¶ 60        The Commission in the *Young* case engaged in a neutral-risk analysis and concluded that the claimant's act of reaching down for the part did not place him at a risk of injury beyond

---

[3]The majority seeks to buttress its analysis by inserting "walking" into the discussion. This is a red herring. In the context of falls, we have consistently held that walking on level ground or up and down stairs is a neutral risk. I do not disagree with that analysis. My concern is isolating a specific bodily movement required by an employee's job duties, such as reaching or turning, and labeling it a neutral risk.

what he would experience as a normal activity of daily living, *i.e.*, he was not exposed to a risk to a greater degree than the general public. *Id*. ¶ 23. In reversing the Commission, we unanimously held that the Commission erred in determining the category of risk to which the claimant was exposed. Because the claimant was engaged in "acts the employer might reasonably have expected him to perform incident to his assigned duties," we concluded that the risk the claimant faced had employment-related characteristics and that it was improper for the Commission to engage in a neutral-risk analysis in determining whether the injury arose out of his work for the employer. *Id*.

¶ 61    We noted that "when a claimant is injured due to an employment-related risk–a risk distinctly associated with his or her employment–it is unnecessary to perform a neutral-risk analysis to determine whether the claimant was exposed to a risk of injury to a greater degree than the general public." *Id*. We further concluded as follows: "Although the act of 'reaching' is one performed by the general public on a daily basis, the evidence in this case established the risk to which claimant was exposed was necessary to the performance of his job duties at the time of injury. His action in reaching and stretching his arm into a deep, narrow box to retrieve a part for inspection was distinctly associated with his employment." *Id*. ¶ 28.

¶ 62    In *Young*, we also cited our recent decision in *Autumn Accolade v. Illinois Workers' Compensation Comm'n*, 2013 IL App (3d) 120588WC, ¶ 18, in which we addressed the issue of whether a caregiver's injury arose out of her employment when she was injured while assisting one of the facility's residents in the shower. The caregiver was reaching to remove a soap dish when she felt a pop in her neck and pain down her right arm. *Id*. We held that the Commission's finding that the caregiver sustained an accident that arose out of her employment was not against the manifest weight of the evidence because the Commission properly concluded that she was injured "while engaged in activities she might reasonably be expected to perform incident to her assigned duties." *Id*. We rejected the employer's argument that a reaching injury was not peculiar to the caregiver's employment because the caregiver "was engaged in an activity she might reasonably be expected to perform incident to her assigned duties, *i.e.*, ensuring the safety of a resident of the assisted living facility." *Id*. ¶ 19. The majority also now disavows our unanimous analysis in *Accolade*.

¶ 63    The analysis used by this court in *Accolade* and *Young* applies equally in the present case. Once it is established that the risk fits within the first risk category outlined above, *i.e.*, risks that are distinctly associated with employment, then it is established that the injury "arose out of" the employment, and it is improper for the Commission to engage in a neutral-risk analysis. *Young*, 2014 IL App (4th) 130392WC, ¶ 23 ("when a claimant is injured due to an employment-related risk–a risk distinctly associated with his or her employment–it is unnecessary to perform a neutral-risk analysis to determine whether the claimant was exposed to a risk of injury to a greater degree than the general public").

¶ 64    The majority cites *Kemp* and *Komatsu Dresser Co.* as examples of precedent where our courts have applied a neutral-risk analysis when workers are injured performing a common bodily movement required by their employment. *Supra* ¶¶ 40-42. However, there are similar cases where a neutral-risk analysis was rejected. For example, in *Interlake, Inc. v. Industrial Comm'n*, 161 Ill. App. 3d 704 (1987), the claimant was working with his supervisor who instructed him to get a screwdriver. When the claimant bent over to retrieve a screwdriver from his tool pouch on the floor, his back " 'snapped.' " The employer argued that

"claimant's act of bending over was a routine personal activity and that therefore claimant has not shown that his injury arose out of and in the course of his employment." *Id.* at 706-07. Noting that the claimant "bent over to pick up a screwdriver at the explicit direction of one of his supervisors," the court held that his injury "was the result of only employment activities." *Id.* at 711. Likewise, in *O'Fallon School District v. Industrial Comm'n*, 313 Ill. App. 3d 413 (2000), the claimant was a sixth grade teacher assigned to hall duty. The employer maintained a strict rule against students running in the halls. When the claimant observed a student running, she "turned, twisted, and began to pursue the child when she felt a pain in her lower back." *Id.* at 415. The arbitrator and the Commission initially determined that the injury "did not arise out of claimant's employment, as the activities of turning, twisting, and beginning to pursue a running child did not expose her to a risk greater than that to which the general public could be exposed," but the circuit court reversed. *Id.* Noting that the claimant "was assigned specifically the task of stopping children from running in the hallways," this court affirmed the circuit court, and held that "[c]ontrary to the arbitrator's conclusion and the Commission's initial decision, claimant's injury did have an origin in a risk arising out of her employment." *Id.* at 416-17.

¶ 65    It is evident that the Commission and the courts have struggled to determine when to employ a neutral-risk analysis and clear guidelines are needed. In my view, the supreme court has provided us with the proper method for analysis: "A risk is incidental to the employment where it belongs to or is connected with what an employee has to do in fulfilling his duties." *Caterpillar Tractor Co.*, 129 Ill. 2d at 58. Thus, we should first determine whether a worker was injured performing activities that were required by his job duties. If so, the risk of being injured performing those activities is distinctly associated with his employment, and a neutral-risk analysis is improper.

¶ 66    In the present case, since May 2007, the claimant had to perform his welding duties from a seated position, using a chair with wheels to maneuver as a result of a separate condition in his right knee. The employer provided the rolling chair to accommodate the claimant's work restrictions while performing work-related tasks. As the Commission found, on the day of the injury, the claimant worked while sitting on his chair, turned to his right in order to perform welding tasks, internally rotated his left knee, and experienced an immediate pop, pain, and a burning sensation in his left knee. Based on these factual findings, the claimant's risk of a left knee injury as a result of an internal rotation was a risk that falls squarely within the risks that are distinctly associated with his employment. The employer paid the claimant to weld lock systems in a seated position under time constraints which, in turn, required him to maneuver the chair and his body to his left and to his right. When we view the mechanism of the claimant's injury in the context of his assigned work duties, it is evident that he was injured while performing a specific movement that he was assigned to perform by his employer. Accordingly, under these facts, although I agree with the ultimate disposition in this case, I believe that the majority's neutral-risk analysis is incorrect.

¶ 67    JUSTICE HARRIS joins in this special concurrence.