# Illinois Official Reports

## Appellate Court

---

**Steak 'n Shake v. Illinois Workers' Compensation Comm'n, 2016 IL App (3d) 150500WC**

---

| | |
|---|---|
| Appellate Court Caption | STEAK 'N SHAKE, Appellant, v. THE ILLINOIS WORKERS' COMPENSATION COMMISSION *et al.* (Joan Anderson, Appellee). |
| District & No. | Third District<br>Docket No. 3-15-0500WC |
| Filed | November 17, 2016 |
| Decision Under Review | Appeal from the Circuit Court of Peoria County, No. 14-MR-833; the Hon. James Mack, Judge, presiding. |
| Judgment | Affirmed as modified. |
| Counsel on Appeal | George F. Klauke, Jr., of Klauke Law Group LLC, of Schaumburg, for appellant.<br><br>Daniel P. Cusack and Thomas M. Watson, of Cusack, Gilfillan & O'Day, LLC, of Peoria, for appellee. |
| Panel | JUSTICE HARRIS delivered the judgment of the court, with opinion.<br>Justices Hoffman and Stewart concurred in the judgment and opinion.<br>Presiding Justice Holdridge specially concurred, with opinion, joined by Justice Hudson. |

**OPINION**

¶ 1    Claimant, Joan Anderson, filed an application for adjustment of claim pursuant to the Workers' Compensation Act (Act) (820 ILCS 305/1 to 30 (West 2008)), alleging she sustained injuries to her right hand and thumb and seeking benefits from the employer, Steak 'n Shake. Following a hearing, the arbitrator found that claimant sustained accidental injuries to her right hand that were causally related to her employment on May 30, 2008. The arbitrator awarded claimant (1) $152\frac{3}{7}$ weeks' temporary total disability (TTD) benefits (June 11, 2008, through January 18, 2010, and February 15, 2010, through June 9, 2011); (2) reasonable and necessary medical expenses excluding a single billing which was denied based upon evidentiary issues; and (3) $112\frac{5}{7}$ weeks' permanent partial disability (PPD) benefits, representing a 55% loss of use of claimant's right hand.

¶ 2    On review, the Illinois Workers' Compensation Commission (Commission) modified the arbitrator's decision by reducing her TTD award and ordering the employer to pay claimant $128\frac{6}{7}$ weeks' TTD benefits (June 11, 2008, through January 18, 2010, and February 15, 2010, through December 24, 2010). It otherwise affirmed and adopted the arbitrator's decision. On judicial review, the circuit court of Peoria County confirmed the Commission's decision. The employer appeals.

¶ 3                                    I. BACKGROUND

¶ 4    The following factual recitation is taken from the evidence presented at the arbitration hearing conducted on October 24 and 29, 2013.

¶ 5    The employer operates a chain of casual fast-food restaurants. In March 2004, claimant began working for the employer as a waitress. On the date of her alleged accident, May 30, 2008, her position with the employer was best described as waitress/trainer/manager. Claimant testified that, on that date, the restaurant was very busy and she was trying to keep the dining room cleaned up to keep the flow of customers moving as quickly as possible. Although she was a manager of that shift, she started bussing tables and carrying tubs of dirty dishes out of the dining room to help keep the customer flow moving. Claimant testified they were "busy as all get out." Further, she testified that she was moving very swiftly, and, as she was wiping down a table, she felt and heard a loud "pop" in her right hand. Claimant testified she immediately felt an excruciating pain (like she had never felt before) that began in her thumb and shot all the way across her hand. She stated, prior to that moment, she had never experienced any pain in her right hand and had never treated for pain to her right hand or any joints in her body.

¶ 6    Claimant testified she immediately informed one of the other managers on duty about the accident. The next day, she informed the appropriate district manager. This testimony was unrebutted.

¶ 7    After going home, claimant sought an appointment with her primary care physician. However, because she could not be seen that day, she obtained an appointment with her husband's physician, Dr. Daniel Hoffman.

¶ 8    Dr. Hoffman's treatment notes establish that claimant presented with symptoms of right hand swelling. He noted tenderness and swelling over the dorsal aspect of the right hand.

Dr. Hoffman diagnosed a soft tissue injury, prescribed pain medication, and referred claimant to Dr. Jeffrey Traina, an orthopedic specialist.

¶ 9 On June 11, 2008, claimant was examined by Dr. Traina. She gave a history of cleaning a table while at work and experiencing sudden and intense pain in her right hand. A physical examination revealed tenderness at the base of the second metacarpal, localized swelling in the same area, and otherwise normal symptoms. Dr. Traina gave an initial impression of edema with pain over the second metacarpal suggestive of overuse. He ordered claimant off work, prescribed a wrist brace and anti-inflammatory medication, and ordered her to return in 10 days.

¶ 10 On June 23, 2008, claimant followed up with Dr. Traina, who observed that claimant's symptoms had improved, but still remained. He continued his order that claimant remain off work and ordered her to follow up with him in three weeks.

¶ 11 On July 24, 2008, Dr. Traina ordered a magnetic resonance imaging (MRI) scan, the results of which he read to show a mild chronic injury to the base of the first metacarpal joint (*i.e.*, the thumb), with some evidence of degenerative changes in the same area. Following the MRI, Dr. Traina allowed claimant to return to work with a restriction of not using her right hand, prescribed physical therapy, and continued anti-inflammatory medication and the use of a hand brace.

¶ 12 On August 12, 2008, claimant was again examined by Dr. Traina. She reported continued symptoms of right hand and thumb pain. Dr. Traina ordered continued physical therapy, continued use of a hand brace, and anti-inflammatories.

¶ 13 From August until October 13, 2008, Dr. Traina ordered a series of treatments, including a special thumb brace and cortisone injections, all of which were reported to be unsuccessful in relieving claimant's symptoms. At that point, Dr. Traina referred claimant to a hand surgeon.

¶ 14 The next recorded treatment for claimant occurred on June 29, 2009, approximately eight months after her last appointment with Dr. Traina, when claimant returned to Dr. Hoffman. Claimant reported continuing pain in her right hand and thumb. Dr. Hoffman observed swelling and tenderness. He diagnosed possible tendonitis and advised claimant to remain off work and to follow up with Dr. Traina.

¶ 15 The record contains a treatment report indicating that, on August 31, 2009, claimant sought treatment from her primary care provider, nurse practitioner Debbie Hayes. The record also established that nurse Hayes referred claimant to Dr. James Williams, an orthopedic hand surgeon at Midwest Orthopedic Center.

¶ 16 On October 22, 2009, claimant was examined by Dr. Williams. She gave a history of pain after wiping tables at work in May 2008. After reviewing all medical treatment records, Dr. Williams recommended a right thumb joint arthroplasty. The surgical procedure was performed on November 13, 2009.

¶ 17 A few days after the surgery, claimant injured her thumb when it was caught in a door at her house. She sought treatment at the emergency department of the local hospital. She was treated and released. Claimant testified that, after the door incident, her postoperative pain increased for a short period of time. She further testified that her pain did not significantly lessen after her surgery.

¶ 18     On February 25, 2010, claimant underwent a surgical procedure to remove one of the pins that had been implanted in the previous surgery. On March 4, 2010, she underwent a second procedure, performed by Dr. Traina, to remove the remaining pins and secure a surgical implant near the base of her thumb. Follow up surgical procedures were performed on June 18, 2010, and June 24, 2010. On July 19, 2010, claimant began a regimen of postoperative physical therapy and reported some relief from her pain. On December 14, 2000, she was discharged from therapy.

¶ 19     Claimant testified that Dr. Traina relocated out of the area. She then attempted to find another orthopedic specialist, but for various reasons was unable to find one in the Peoria area. Ultimately, she began treatment with Dr. James Rhodes, an orthopedic specialist associated with Rush Hospital in Chicago.

¶ 20     On April 6, 2011, Dr. Rhodes first examined claimant. His impression was that claimant's continuing symptoms were the result of her surgical procedures. He recommended further surgery to alleviate her symptoms. Several attempts to schedule an appointment with a surgical specialist were unsuccessful.

¶ 21     On October 19, 2011, claimant was examined by Dr. Robert Wysocki, a board certified orthopedic specialist, at the employer's request. Dr. Wysocki attributed the onset of claimant's symptomology to the table wiping incident on May 30, 2008. However, he opined that, while the symptoms manifested as a result of claimant's table wiping, her current condition of ill-being was not causally related to her work activities on May 30, 2008. He reasoned that he would not expect the wiping motions claimant engaged in on that date would be significant enough to alter the natural progression of a likely degenerative arthritic condition in her thumb. As to whether claimant's activities on May 30, 2008, aggravated claimant's existing arthritic condition, Dr. Wysocki opined that he did not view the wiping motion as "significant enough trauma" to aggravate a preexisting condition. Dr. Wysocki placed claimant at maximum medical improvement (MMI) and believed an appropriate permanent restriction would be no lifting, pushing, or pulling of more than five pounds with the right hand, and no fine motor use of the right hand. He suggested a functional capacity evaluation (FCE) to more accurately set claimant's permanent restrictions.

¶ 22     At the time of the hearing, claimant testified she continued to suffer near constant pain in the thumb area of her right hand. When told that the only surgical procedure that might alleviate her condition involved the amputation of the thumb, she elected to forego further surgical treatment.

¶ 23     Regarding her daily activities, claimant testified that her employment with the employer was terminated on September 30, 2008. She received short and long term disability income through the employer from June 2008 through July 2009. In June 2011, she began working as a supervisor of a commercial/residential cleaning service where she remained until, December 2011, when that company relocated. In January 2012, she started her own cleaning business, supervising the work of two employees. Her employment activities included scheduling appointments, handling bookkeeping and banking activities, client relations, and occasionally traveling with her employees to supervise their activities.

¶ 24     Regarding her current physical limitations, claimant testified that her right thumb was useless, she experienced a constant dull aching sensation, and any bumping of her thumb caused sharp pain. She further testified that she could "sometimes" use her right hand, occasionally carrying a book or a tool. She took daily pain medication prescribed by Hayes.

¶ 25    The employer introduced video of claimant engaged in utilizing her right hand in activities such as putting a key in a car door, opening a bottle, carrying small objects, mopping a floor, and carrying garbage bags and paper towel rolls. The employer also introduced business logs from cleaning business customers purporting to establish that claimant herself engaged in cleaning activities rather than merely supervising others. On rebuttal, claimant testified that she could, occasionally, lift and carry small objects by avoiding the use of her thumb and utilizing her index finger as a replacement for her thumb. Additionally, a local television news reporter testified for claimant that, in her opinion, the employer's video tape had gaps and other signs of possible editing.

¶ 26    The arbitrator found that claimant established she suffered an industrial accident on May 30, 2008, which aggravated the preexisting arthritic condition of her thumb. The arbitrator noted that the action of wiping down tables so as to keep the flow of customers moving in a busy restaurant exposed the claimant to a risk of injury greater than that of the general public. In finding claimant's injuries were causally related to her employment, the arbitrator noted that "injuries resulting from a neutral risk are not generally compensable and do not arise out of the employment, unless the employee was exposed to the risk to a greater degree than the general public." The arbitrator noted that, given claimant's role in supervising the dining room operation, it would be reasonable to expect that she would perform the task of cleaning off tables in an expeditious manner to facilitate the efficient flow of customers. Thus, claimant's job duties required her to "hurriedly" wipe down multiple tables. The arbitrator further found that claimant had established she suffered from a preexisting arthritic condition, which was asymptomatic prior to her activities on May 30, 2008. Additionally, she found claimant's work activities on that date were clearly a causative factor in her current condition of ill-being. In doing so, the arbitrator referred to Dr. Wysocki's observation that claimant's work activities on May 30, 2008, caused "a manifestation of symptoms" while acknowledging that Dr. Wysocki did not believe that claimant's current condition was causally related to her movements on that date. Despite Dr. Wysocki's ultimate opinion regarding causation, the arbitrator determined that the sequence of events established a sufficient causal link between the May 30, 2008, accident and claimant's subsequent condition of ill-being.

¶ 27    Regarding the nature and extent of claimant's permanent injuries, the arbitrator made note of claimant's work restrictions last imposed by Dr. Traina, as well as Dr. Wysocki's recommendations regarding the limited use of her right hand. Additionally, the arbitrator made note of her own observations of claimant at the hearing, pointing out that it was obvious claimant "suffered significant atrophy and deformity in her right thumb and hand as a result of the treatment for her right thumb condition that would reasonably inhibit the functionality of her right hand." Based upon all the evidence, the arbitrator awarded claimant a PPD award for a 55% loss of use of her right hand.

¶ 28    The employer sought review by the Commission, which modified the arbitrator's award of TTD benefits, but otherwise affirmed and adopted the arbitrator's decision. Regarding causation, the Commission adopted the arbitrator's neutral-risk analysis. It further noted that the absence of symptoms prior to May 30, 2008, and the extensive testimony of symptoms and medical treatment manifesting after that accident date, was sufficient to support a finding of causation. The Commission further noted that, while there was no express medical opinion testimony that the May 30, 2008, accident aggravated claimant's preexisting condition, Dr.

Wysocki's opinion that the incident was not causative of claimant's condition was contradicted by all the medical evidence reflecting an ongoing condition that began on the date of the accident. Regarding the arbitrator's permanency award, the Commission noted that the award was supported by the evidence, particularly in view of claimant's multiple surgeries and postoperative complications.

¶ 29  The employer sought judicial review in the circuit court of Peoria County, which confirmed the Commission's decision. This appeal followed.

¶ 30                                     II. ANALYSIS
¶ 31                              A. Arising out of Employment
¶ 32  On appeal, the employer challenges the Commission's finding that claimant's injuries were causally related to her employment. It argues that wiping tables was not within the purview of claimant's job duties as a manger and that such an activity did not create an increased risk of injury for claimant over that experienced by the general public.

¶ 33  To recover benefits under the Act, a claimant bears the burden of proving by a preponderance of the evidence that his or her injury "arose out of" and "in the course of" the employment. *First Cash Financial Services v. Industrial Comm'n*, 367 Ill. App. 3d 102, 105 (2006). Whether a claimant's injury arose out of and in the course of her employment is a question of fact for the Commission, and its determination will not be disturbed on review unless it is against the manifest weight of the evidence. *Nascote Industries v. Industrial Comm'n*, 353 Ill. App. 3d 1056, 1059-60 (2004). "A finding of fact is contrary to the manifest weight of the evidence only where an opposite conclusion is clearly apparent." *Metropolitan Water Reclamation District of Greater Chicago v. Illinois Workers' Compensation Comm'n*, 407 Ill. App. 3d 1010, 1013 (2011).

¶ 34  A claimant's injury "arises out of" employment if it "had its origin in some risk connected with, or incidental to, the employment so as to create a causal connection between the employment and the accidental injury." *Sisbro, Inc. v. Industrial Comm'n*, 207 Ill. 2d 193, 203 (2003). This court has held there are three types of risks to which an employee might be exposed: (1) risks distinctly associated with the employment; (2) risks that are personal to the employee; and (3) neutral risks that have no particular employment or personal characteristics. *First Cash Financial Services*, 367 Ill. App. 3d at 105.

¶ 35  Injuries resulting from a risk distinctly associated with employment, *i.e.*, an employment-related risk, are compensable under the Act. Risks are distinctly associated with employment when, at the time of injury, "the employee was performing acts he was instructed to perform by his employer, acts which he had a common law or statutory duty to perform, or acts which the employee might reasonably be expected to perform incident to his assigned duties." *Caterpillar Tractor Co. v. Industrial Comm'n*, 129 Ill. 2d 52, 58 (1989). "A risk is incidental to the employment where it belongs to or is connected with what an employee has to do in fulfilling his duties." *Id.*

¶ 36  Conversely, "[i]njuries resulting from a neutral risk generally do not arise out of the employment and are compensable under the Act only where the employee was exposed to the risk to a greater degree than the general public." *Metropolitan Water*, 407 Ill. App. 3d at 1014. "Such an increased risk may be either qualitative, such as some aspect of the employment which contributes to the risk, or quantitative, such as when the employee is

exposed to a common risk more frequently than the general public." *Id.* "Neutral risks include stray bullets, dog bites, lunatic attacks, lightning strikes, bombing, and hurricanes." *Illinois Institute of Technology Research Institute v. Industrial Comm'n*, 314 Ill. App. 3d 149, 163 (2000). As stated, neutral risks have no particular employment-related characteristics. *First Cash Financial Services*, 367 Ill. App. 3d at 105.

¶ 37    In this case, the Commission employed a neutral-risk analysis and determined claimant's injury was compensable because she was exposed to a risk to a greater degree than the general public. As indicated, the employer challenges the Commission's decision, arguing that merely wiping a table at work does not create an increased risk of an accident greater than that to which the general public might be exposed while wiping a table in their own home. After reviewing the record, we agree with the Commission's ultimate conclusion that claimant sustained a compensable injury; however, we find it was unnecessary for the Commission to reach a neutral-risk analysis as claimant's injury stemmed from a risk distinctly associated with her work for the employer.

¶ 38    Our first step in analyzing risk is to determine whether the claimant's injuries resulted from an employment-related risk. See *Young v. Illinois Workers' Compensation Comm'n*, 2014 IL App (4th) 130392WC, ¶ 23 (stating "when a claimant is injured due to an employment-related risk *** it is unnecessary to perform a neutral-risk analysis to determine whether the claimant was exposed to a risk of injury to a greater degree than the general public"). In this case, claimant was injured while wiping down a table at work. Her unrebutted testimony established that her duties as a manager were to keep the flow of customers moving in an efficient manner. She credibly testified that, to that end, she would on occasion clean and bus tables if necessary to keep the customer flow moving. The employer provided no evidence to rebut claimant's credible testimony. Thus, the record establishes that claimant was injured while engaged in an activity that the employer might reasonably have expected her to perform in the fulfillment of her job duties. Claimant's injury, therefore, resulted from a risk distinctly associated with her employment, and the manifest weight of the evidence supports the Commission's ultimate finding of a compensable injury.

¶ 39                          B. Causation—Preexisting Condition

¶ 40    The employer next argues that the Commission's finding that claimant's current condition of ill-being was causally related to her employment was against the manifest weight of the evidence. It maintains that claimant's condition was solely related to her preexisting degenerative arthritis and not her employment.

¶ 41    To obtain compensation under the Act, a claimant must prove that some act or phase of her employment was a causative factor in her ensuing injuries. *Land & Lakes Co. v. Industrial Comm'n*, 359 Ill. App. 3d 582, 592 (2005). A work-related injury need not be the sole or principal causative factor, as long as it was a causative factor in the resulting condition of ill-being. *Sisbro*, 207 Ill. 2d at 205. A finding by the Commission that a claimant's injuries are causally related to employment activities is a question of fact, and the Commission's finding will not be overturned unless it is against the manifest weight of the evidence. *Id.*

¶ 42    Here, the Commission found claimant's asymptomatic condition prior to May 30, 2008, followed by the immediate onset of symptoms after the work accident was sufficient to

establish a causal relationship between her subsequent condition of ill-being and her work accident. The Commission further noted that the medical evidence established that claimant suffered from a degenerative arthritic condition with symptoms manifesting only after the May 30, 2008, accident. It is well-settled that the Commission may infer causation from a sequence of lack of symptoms prior to an industrial accident, with symptom manifestation immediately following the accident. *Id.* at 207-08; *Freeman United Coal Mining Co. v. Industrial Comm'n*, 318 Ill. App. 3d 170, 175 (2000). That particular sequence of events occurred in the instant matter and it was within the Commission's purview to find that the sequence established the causative link necessary for awarding compensation.

¶ 43    The employer argues that Dr. Wysocki's causation opinion that claimant's condition was not causally related to her employment was the only evidence regarding causation that the Commission should have considered. We disagree. It is within the Commission's purview to weigh medical testimony and its decision will not be overturned unless it is against the manifest weight of the evidence. *Roper Contracting v. Industrial Comm'n*, 349 Ill. App. 3d 500, 506 (2004). Moreover, as the Commission noted, even Dr. Wysocki acknowledged that claimant was symptom free prior to the alleged accident, and the table wiping caused "symptom manifestation." Given the undisputed record regarding the sequence of events, it cannot be said that the Commission's finding that claimant's current condition of ill-being was causally related to the May 30, 2008, accident was against the manifest weight of the evidence.

¶ 44                                C. Medical Expenses

¶ 45    The employer further contends that the Commission's award of medical expenses was against the manifest weight of the evidence. However, since this argument is based solely upon the premise that the Commission's finding on causation was erroneous, a premise which we have rejected, we also reject this contention without the need for further analysis. *Tower Automotive v. Illinois Workers' Compensation Comm'n*, 407 Ill. App. 3d 427, 436 (2011).

¶ 46    Additionally, the employer points out that the Commission awarded a double recovery for a bill submitted by Comprehensive Solutions, which was included in a Medicaid lien previously paid. Claimant agrees that the medical benefit award should be modified to reflect the prior payment to Comprehensive Solutions.

¶ 47                                D. TTD Benefits

¶ 48    The employer also maintains that the Commission's award of TTD benefits was against the manifest weight of the evidence. In this regard, the employer alleges claimant failed to establish causation between her condition of ill-being and her employment. Having previously rejected the employer's contention that the Commission's finding on causation was erroneous, we decline to overturn the Commission's award of TTD benefits on this basis. *Id.*

¶ 49    Alternatively, the employer maintains that the Commission erred in awarding TTD benefits for periods where the claimant failed to establish that she was unable to work. TTD benefits are available from the time an injury incapacitates an employee from work until such time as the employee is as far recovered or restored as the permanent character of the injury will permit. *Westin Hotel v. Industrial Comm'n*, 372 Ill. App. 3d 527, 542 (2007). Our review

of the record establishes that the Commission's award of TTD benefits corresponded to time periods when claimant was under a work restriction that prevented her from returning to work. The Commission's TTD award was not against the manifest weight of the evidence.

¶ 50                                  E. PPD Benefits

¶ 51        Finally, the employer argues that the Commission's award of PPD benefits was against the manifest weight of the evidence. The determination of permanent partial loss of use of a member is not capable of a mathematically precise determination, and estimation of partial loss is peculiarly the function of the Commission. *Pemble v. Industrial Comm'n*, 181 Ill. App. 3d 409, 417 (1989). Because of the Commission's expertise in the area of workers' compensation, its finding on the question of the nature and extent of disability should be given substantial deference. *Id.* It is for the Commission to assess the credibility of the witnesses, resolve conflicts in the evidence, assign weight to be accorded the evidence, and draw reasonable inferences from the evidence. *Hosteny v. Illinois Workers' Compensation Comm'n*, 397 Ill. App. 3d 665, 674 (2009). As such, the Commission's decision regarding the nature and extent of a claimant's disability will not be set aside on review unless it is contrary to the manifest weight of the evidence. *Pemble*, 181 Ill. App. 3d at 417.

¶ 52        Here, in reaching its permanency determination, the Commission relied upon the credible testimony of claimant regarding the restrictions to her work and daily activities; the medical opinions as to claimant's permanent restrictions; and to a significant degree, the arbitrator's observation of claimant's "significant atrophy and deformity in [claimant's] right thumb and hand." Based upon the totality of the record, we cannot say that the Commission's finding on permanency was against the manifest weight of the evidence.

¶ 53                                  III. CONCLUSION

¶ 54        The judgment of the circuit court of Peoria County, confirming the decision of the Commission, is modified by agreement to reflect that the medical expense incurred for services rendered by Comprehensive Solutions was paid. The judgment as modified is affirmed.

¶ 55        Affirmed as modified.

¶ 56        PRESIDING JUSTICE HOLDRIDGE, specially concurring.

¶ 57        I join in the majority's judgment. I write separately to clarify what I consider to be the proper analysis governing claims like those presented in this case. The majority concludes that the claimant's injury was compensable because the act of wiping tables was "distinctly associated with [her] employment." I disagree. I would uphold the Commission's analysis of the claim under neutral risk principles. In my view, a neutral risk analysis is required by our recent decision in *Adcock v. Workers' Compensation Comm'n*, 2015 IL App (2d) 130884WC, ¶¶ 38-44 and other precedents.

¶ 58        As we noted in *Adcock*, our supreme court has ruled that the purpose of the Act is to protect the employee against risks and hazards which are "peculiar to the nature of the work he is employed to do." *Orsini v. Industrial Comm'n*, 117 Ill. 2d 38, 44 (1987). Accordingly, "[f]or an injury to have arisen out of the employment, the risk of injury must be a risk

peculiar to the work or a risk to which the employee is exposed to a greater degree than the general public by reason of his employment." *Id.* at 45; see also *Karastamatis v. Industrial Comm'n*, 306 Ill. App. 3d 206, 209 (1999) (ruling that "in order for an injury to arise out of one's employment, the risk must be: (1) a risk to which the public is generally not exposed but that is peculiar to the employee's work, or (2) a risk to which the general public is exposed but the employee is exposed to a greater degree"). If neither of these factors apply, *i.e.*, if the injury is caused by an activity of daily life to which all members of the public are equally exposed (or by a risk personal to the employee), then there can be no recovery under the Act, even if the employee was required to perform that activity by virtue of his employment. *Adcock*, 2015 IL App (2d) 130884WC, ¶ 38. In such cases, the risk leading to the injury is not "connected with" or "incidental to" the employment; rather, it is merely a personal risk or a risk of everyday living. *Id.*

¶ 59    Applying these principles in *Adcock*, we held that, where an employee is injured on the job while performing an activity of everyday living (such as bending, stooping, walking, or reaching), a neutral risk analysis governs the employee's claim, even if he was required to perform the act at issue as part of his employment duties. *Id.* ¶¶ 38-44. We have applied a neutral risk analysis to similar claims in other cases. See *id.* ¶¶ 40-42 (citing *Kemp v. Industrial Comm'n*, 264 Ill. App. 3d 1108 (1994); *Komatsu Dresser Co. v. Industrial Comm'n*, 235 Ill. App. 3d 779 (1992); *Nabisco Brands, Inc. v. Industrial Comm'n*, 266 Ill. App. 3d 1103 (1994)).

¶ 60    Moreover, as we noted in *Adcock*, our supreme court's decision in *Caterpillar Tractor Co. v. Industrial Comm'n*, 129 Ill. 2d 52, 58 (1989) does not require a different conclusion. See *Adcock*, 2015 IL App (2d) 130884WC, ¶ 39. In *Caterpillar*, our supreme court ruled that "[t]ypically, an injury arises out of one's employment if, at the time of the occurrence, the employee was performing acts he was instructed to perform by his employer, acts which he had a common law or statutory duty to perform, or acts which the employee might reasonably be expected to perform incident to his assigned duties." *Caterpillar Tractor Co.*, 129 Ill. 2d at 58. Although we agreed that injuries caused by such acts "typically" arise out of the employment, we noted in *Adcock* that this is not always the case. We ruled that "[t]he Commission should not award benefits for injuries caused by everyday activities like walking, bending, or turning, even if an employee was ordered or instructed to perform those activities as part of his job duties, unless the employee's job required him to perform those activities more frequently than members of the general public or in a manner that increased the risk." *Adcock*, 2015 IL App (2d) 130884WC, ¶ 39. In other words, we held that a neutral risk analysis should govern such claims. *Id.*

¶ 61    In the instant case, the claimant was injured while performing an activity of everyday living (wiping a table). Thus, pursuant to *Adcock*, *Orsini*, and other precedents, she may recover benefits under the Act only if she can show that she faced the risk of injury posed by wiping tables more frequently or in a qualitatively greater manner than do members of the general public. We may not award benefits merely because wiping tables was part of her job duties. In other words, we must apply a neutral risk analysis to her claims.

¶ 62    Applying a neutral risk analysis, the Commission correctly found that the claimant was exposed to a risk greater than that encountered by the general public. The Commission adopted the arbitrator's finding that the claimant had established both a quantitative and qualitative degree of increased risk. As to the quantitative degree of increased risk, the

claimant's unrebutted testimony was that she engaged in wiping down "tables" on May 30, 2008. That distinguishes the claimant from a typical member of the general public, who might wipe down a single table in his or her own kitchen or dining room. As to the qualitative degree of increased risk, the record clearly supports the Commission's finding. The record established that, at the time of her injury, the claimant was working at a hurried pace because the restaurant was "busy as all get out." It was the claimant's unrebutted testimony that the injury occurred while she was in a hurried state, attempting to clean the tables as quickly as possible in order to keep the flow of customers moving. Accordingly, the Commission reasonably concluded that the hurried nature of the claimant's activities might increase the risk that an injury would occur while she was performing her job duties.

¶ 63     In my view, the Commission applied the proper analysis (*i.e.*, a neutral risk analysis) and reached the proper conclusion. The Commission's findings were not against the manifest weight of the evidence. I would therefore affirm the Commission's decision in all respects.

¶ 64     JUSTICE HUDSON joins in this special concurrence.