2020 IL App (2d) 190974WC-U
No. 2-19-0974WC
Order filed November 10, 2020

**NOTICE:** This order was filed under Illinois Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

Workers' Compensation Commission Division

_____

| | | |
|---|---|---|
| RLES CONSOLIDATED UNIT SCHOOL DISTRICT #303, | ) ) ) | Appeal from the Circuit Court of Kane County, Illinois |
| Appellant, | ) ) | |
| v. | ) ) | No. 19-MR-186 |
| THE ILLINOIS WORKERS' COMPENSATION COMMISSION *et al.* | ) ) ) | Honorable Kevin T. Busch, |
| (Eileen Budzban, Appellee). | ) | Judge, Presiding. |

_____

JUSTICE CAVANAGH delivered the judgment of the court.
Presiding Justice Holdridge and Justices Hoffman, Hudson, and Barberis concurred in the judgment

**ORDER**

¶ 1    *Held*: (1) By finding that the petitioner's current condition of ill-being was caused by an accident arising out of and in the course of her employment, the Illinois Workers' Compensation Commission did not make a finding that was against the manifest weight of the evidence. (2) The amounts of permanent partial disability benefits and temporary total disability benefits that the Illinois Workers' Compensation Commission awarded to the petitioner are not against the manifest weight of the evidence.

¶ 2     Petitioner, Eileen Budzban, was a school bus driver for respondent, St. Charles Consolidated Unit School District #303. While walking around a bus, inspecting it before setting out on her route, petitioner slipped on ice and fell, striking her head. The Illinois Workers' Compensation Commission (Commission) awarded her permanent partial disability benefits pursuant to 8(d)(2) of the Workers' Compensation Act (Act) (820 ILCS 305/8(d)(2) (West 2010)) and temporary total disability benefits pursuant to section 8(b) of the Act (*id.* § 8(b)). Respondent appealed to the Kane County circuit court, challenging the amounts of those benefits as excessive. The court confirmed the Commission's decision, finding it to be not against the manifest weight of the evidence. Respondent appeals, challenging the amounts of the benefits and the Commission's finding of causation. Because the Commission's decision is not against the manifest weight of the evidence, we affirm the circuit court's judgment, which confirmed the Commission's decision.

¶ 3                                I. BACKGROUND

¶ 4     In the proceedings before the Commission, it was undisputed that petitioner was injured in an accident at work. The parties stipulated that on December 6, 2010, she sustained accidental injuries that arose out of and in the course of her employment as a school bus driver for respondent. Petitioner, by her own account, was walking around a bus, doing a preliminary inspection, when she slipped on ice and fell. Her head struck the ground. She was unable to get back on her feet or even roll over, and she saw blackness. It was not until about 45 minutes to an hour later, petitioner was told, that a coworker came looking for her and found her lying where she had fallen.

¶ 5     Petitioner was taken by ambulance to the emergency department of Delnor Hospital. According to the medical history taken there, petitioner had suffered a head trauma but had not lost consciousness. She complained of severe occipital pain and of pain in her neck and back. Also,

she said that she felt drowsy. A computed tomography (CT) scan of her brain showed no acute changes. The diagnostic impressions in the emergency department were (1) an acute closed head injury without loss of consciousness and (2) an acute cervical and lumbar strain. Petitioner was discharged that same day with head-injury instructions.

¶ 6      On December 13, 2010, petitioner followed up with her primary-care physician, Dr. John K. Boblick of Loyola Medicine (Loyola), who was board-certified in internal medicine. Petitioner reported to him that she had fallen at work and had lost consciousness; that, after bouts of vomiting, she had returned to the emergency room; and that she still suffered from dizziness, headaches, and a feeling of fuzziness. It does not appear, from Dr. Boblick's records, that petitioner had ever reported such symptoms before. (Petitioner testified in the arbitration hearing that Dr. Boblick had been her primary-care physician for 29 years.) Dr. Boblick diagnosed post-concussion syndrome and advised her to remain off work.

¶ 7      Petitioner saw Dr. Boblick several more times, complaining of dizziness, fatigue, achiness, and headaches. In January 2011, Dr. Boblick decided to keep her off work, and he referred her to the neurology department of Loyola.

¶ 8      In February 2011, petitioner went to Dr. Murray Flaster of Loyola for a neurological evaluation. He reviewed some previous diagnostic studies, specifically an X-ray of the cervical spine and a CT scan of the head and cervical spine, all of which, he agreed with the interpreters, showed no abnormality. His neurological examination of petitioner determined her cognition to be intact, without any apparent problems with memory or doing calculations. She seemed to have no difficulty in using, comprehending, or articulating words. Her gait and balance were normal. After his examination of petitioner, Dr. Flaster diagnosed a mild post-concussive disorder that, as far as he could tell, was beginning to go away. Nevertheless, because petitioner was still having

headaches, he ordered magnetic resonance imaging (MRI) of her brain. The MRI showed no abnormality.

¶ 9    When petitioner returned to Dr. Flaster in March 2011, he again found no neurological abnormality. Gait was normal, and petitioner could bend over and move her head without discomfort. She reported that her headaches and dizziness were subsiding and that she had been driving her granddaughter to places. Dr. Flaster assumed that the post-concussive syndrome would go away completely and that when petitioner felt well enough, she could resume her work as a school bus driver.

¶ 10    In May 2011, though, petitioner complained to Dr. Flaster that she still was having headaches and that she now was struggling with fatigue and an inability to concentrate. The latter two symptoms were new. Dr. Flaster ordered an MRI of the cervical spine and an electroencephalogram (EEG), both of which came back normal. Nevertheless, he recommended that petitioner stay off work until she obtained another medical opinion.

¶ 11    Petitioner continued to see Dr. Boblick, who noted that, ever since the head trauma, petitioner seemed to be suffering from some sort of functional disorder. In June 2011, petitioner reported to Dr. Boblick that, because of dizziness, she had not been driving. In August 2011, Dr. Boblick ordered a neuropsychological evaluation.

¶ 12    In March 2012, Dr. Kyle Bonesteel of Loyola performed the neuropsychological evaluation. His diagnostic impressions were that petitioner had a neurocognitive impairment beyond what would be expected for someone her age and that she had post-concussive syndrome. He deemed her to be neurologically unfit to drive a bus.

¶ 13    In April 2012, according to Dr. Boblick's notes, petitioner was still having headaches, and now she was having memory problems too. Dr. Boblick's assessment was post-concussive encephalopathy. He believed that petitioner was in need of brain rehabilitation.

¶ 14    In June 2014, on referral from Dr. Boblick, petitioner saw Dr. Michael J. Schneck of Loyola for a neurological consultation. Petitioner told Dr. Schneck that she had dizziness, headaches, photosensitivity, anxiety, and difficulty in walking and finding words. In his neurological examination of petitioner, Dr. Schneck found exaggerated speech and atypical aphasia (difficulty using or comprehending words) that, to him, were not suggestive of any organic speech defect. He concluded, rather, that petitioner had a somatization disorder.

¶ 15    Dr. Schneck later wrote in his report of June 2016: "[Petitioner] likely has a somatization disorder based on the exam. I disagree with the interpretation of findings by Dr. Bonsteel [*sic*] that her [symptoms] are related to a postconcussion syndrome at this time (though that might have been the initial trigger for her problem.[)]" Suspecting that petitioner had a "more complex[,] longstanding psychiatric syndrome," Dr. Schneck recommended that she undergo a psychiatric evaluation and neuropsychological testing.

¶ 16    In July 2014, again on referral from Dr. Boblick, petitioner underwent a neuropsychological examination by Dr. Susan Walsh of Loyola. She diagnosed posttraumatic stress disorder and somatoform disorder.

¶ 17    In January 2016, petitioner was further evaluated by Dr. Anjum Sayyad of Marionjoy Rehabilitation Hospital (Marionjoy). Petitioner complained to Dr. Sayyad that she was sensitive to noise and light, there was a tingling in the back of her head, her speech was slurred, and she had difficulty finding words. It was Dr. Sayyad's impression that petitioner had post-concussive syndrome. Dr. Sayyad recommended physical, occupational, and speech therapy as well as a

neuro-optometry evaluation. Petitioner continued to follow up with Dr. Sayyad, who in May 2016 recommended that she continue a home exercise program.

¶ 18     In May 2016, petitioner consulted Dr. Silpa Katta of Marionjoy, reporting to Dr. Katta that she still was having intermittent headaches. Dr. Katta diagnosed post-concussive syndrome and chronic intractable headaches and gave petitioner information about Botox injections.

¶ 19     In June 2016, Dr. Boblick's evidence deposition was taken. He opined that, in her fall at work, petitioner sustained a significant head injury that had left her with post-concussive encephalopathy, or post-concussive syndrome, a condition from which she was unlikely to recover. Dr. Boblick attached particular significance to petitioner's self-reported loss of consciousness for 45 minutes as a result of her fall—although Dr. Boblick could not recall reviewing the records from Delnor Hospital to see if petitioner had reported a loss of consciousness to the emergency-department personnel. Dr. Boblick had reached his opinions as to causation and duration even though, as he acknowledged, all of the imaging studies and other diagnostic studies had been normal and even though he had found no organic pathology that would explain petitioner's functional disorders. He believed that she had continuing problems from her fall and that the problems were real. She no longer had the coordination and mental ability to be a school bus driver. Dr. Boblick was unaware of any other physician who had placed restrictions on what petitioner could do, and admitted that his perception of petitioner's inability to work was based at least in part on her own reporting of symptoms. It was impossible to confirm, by objective testing, whether her complaints of headaches and unsteadiness were genuine.

¶ 20     In April 2017, Dr. Sayyad's evidence deposition was taken. She testified that she was board-certified in physical medicine and rehabilitation and also in brain injury medicine and that she was the director of the brain injury program at Marionjoy. According to Dr. Sayyad, petitioner

had post-concussive syndrome caused by her fall at work, and this work-related injury "probably exacerbated the [petitioner's] psychological symptoms." Dr. Sayyad explained:

"[P]ost-concussion syndrome has a component that affects the psychological realm in these patients. It can impact sleep. It can impact mood. It can impact headaches, balance. All of those things are under the umbrella of post-concussion syndrome.

Having said that, my sense is that there was probably some psychological impairment prior to, though I have no real evidence, objective evidence for it, that preceded the actual injury."

¶ 21 When asked on what evidence she based her opinion that the fall had caused post-concussive syndrome, Dr. Sayyad answered: "That her symptoms, the specific symptoms of not being able to walk, her balance, her sensitivity to light, those specific symptoms following the injury; and, therefore, the injury was the source of her post-concussive syndrome." Despite those symptoms, Dr. Sayyad had never placed any physical restrictions on petitioner, who "was able to walk independently with a walker, meaning it was a modified independent level." The impaired balance and other symptoms could be party psychological. Dr. Sayyad testified: "Often psychological symptoms are worsened after an injury like this and are difficult to treat following injury, much more so than individuals who don't have a prior history of it."

¶ 22 From either petitioner or her husband, Dr. Sayyad had received a history that petitioner lost consciousness for 45 minutes. Dr. Sayyad would "describe that as a fairly significant period of loss of consciousness following a head injury." Dr. Sayyad could not recall if she had reviewed any records from Delnor Hospital. Respondent's attorney asked Dr. Sayyad:

"Now if the records from that facility record that [petitioner] reported no loss of consciousness following this incident, would that be a significant inconsistency with the history that you were originally provided by her and/or her husband?

A. It could be."

¶ 23    In March and June 2011 and December 2014, at respondent's request, petitioner underwent physical examinations by Dr. Gary S. Skaletsky, a board-certified neurosurgeon. See 820 ILCS 305/12 (West 2010). In September 2017, his evidence deposition was taken.

¶ 24    In his evidence deposition, Dr. Skaletsky recounted his three examinations of petitioner. He initially examined her on March 17, 2011, receiving from her a history that she had fallen to the ground, struck the back of her head, and lost consciousness. She told him that, ever since her fall at work, she had suffered from unremitting occipital headaches, dizziness with activity, and a failing memory. She trusted herself to drive only short distances.

¶ 25    In addition to taking this history from petitioner, Dr. Skaletsky reviewed the diagnostic studies, all of which showed no abnormality. Also, he reviewed the emergency-department records from Delnor Hospital, which, he noted, lacked any mention of a loss of consciousness. Even so, Dr. Skaletsky testified, concussion syndrome "[did] not require a loss of consciousness." On the basis of the history he had received from petitioner, his physical examination of her, and his review of her medical records, Dr. Skaletsky diagnosed a cerebral concussion and an acute cervical strain. He recommended four weeks of physical therapy to alleviate the cervical sprain, after which, he anticipated, she could resume normal activities without any restrictions.

¶ 26    The next examination that Dr. Skalestsky performed of petitioner was on June 21, 2011. Her reported symptoms had not subsided, and maybe they had even grown worse. Now all areas of her head hurt, and she had become hypersensitive to light and sound. Dr. Skaletsky thought that

because petitioner had not received the physical therapy he had recommended, she was suffering from the effects of deconditioning. He recommended physical therapy and muscle relaxants for six weeks, after which she could return to work without restrictions.

¶ 27    On December 1, 2014, Dr. Skaletsky examined petitioner a third time. She complained to him of headaches, neck pain, mid and lower back pain, slowness of speech, and muscle weakness over her entire body. She was overly sensitive to light and sound, and she was unsteady on her feet, needing something to hold onto as she walked. Also, she reported decreased sensation on the entire right side of her body, including her face. Petitioner told him she had not driven a vehicle since the date of the accident (although, Dr. Skaletsky noted, she had told him in March 2011 that she drove short distances), and she said that all the tasks of daily life, including housework, cleaning, and the preparation of meals, had to be done by family members.

¶ 28    Dr. Skaletsky found the following in his third physical examination of petitioner. She was wearing prescription glasses under her sunglasses, and even though the room was dark, she squinted when the sunglasses were removed. She had an unsteady gait, but the unsteadiness did not appear to be specific or uniform: when unassisted, she did not lurch in any particular direction. When requested to touch her nose, she touched near her ears, both when her eyes were open and when they were closed. In her complaint of diffuse weakness, she exhibited no particular neurologic pattern. Her speech was slow except when she was describing her limitations and expressing her frustrations with trying to obtain approval for treatment.

¶ 29    After this third physical examination of petitioner, Dr. Skalestsky was unable to square the current findings and complaints with the diagnosis from 2011. He could find no anatomic or physiological reason for the current clinical presentation. In his view, petitioner should have been

able to return to work, without restrictions, in July 2011. He considered her to be in no need of further treatment. He agreed with Dr. Schneck that petitioner had a somatization disorder.

¶ 30 According to petitioner's testimony in the arbitration hearing, she still had head pain that remained with her all day. She was overly sensitive to light and noise. She got dizzy bending over, and she had to use a walker for balance. She noticed that her speech was different. She testified: "[I]t's either I drag [out the words,] or for some reason I don't get the other part of the word." She no longer drove. She no longer had a driver's license.

¶ 31 Prior to her fall, she testified, her health was just fine. For several years before December 2010, she had been driving school buses. Before that, she had a laundry business, in which she hired employees, filled out forms, and made calculations. Ever since her fall on the ice, she had not worked, and effective May 21, 2016, she had officially retired from her job as a school bus driver. On June 14, 2016, respondent notified her that it had accepted her retirement.

¶ 32 On cross-examination, petitioner testified that she did not know personally but had been told it was 45 minutes to an hour after she fell that she was found lying on the ground. Because she had not shown up for her scheduled pickups, her coworkers went looking for her and found her. She had no memory of that period of 45 minutes to an hour. Nor could she remember providing a history at Delnor Hospital.

¶ 33 In her recommended decision, the arbitrator observed that because the parties had stipulated that petitioner was injured in an accident arising out of and in the course of her employment with respondent, the only remaining question was whether petitioner's current condition of ill-being was causally related to that accident. The answer to that question depended partly on whether petitioner (1) suffered a loss of consciousness as a result of the fall and (2) had any prior medical or neurological problems.

¶ 34    "Even without expert medical opinion," the arbitrator wrote, "[p]etitioner's loss of mental capabilities is obvious in her extreme difficulty in answering questions, recalling facts and as she struggles to find simple words to answer basic questions. She walks with a walker and had obvious physical limitations." Although petitioner appeared to have "some history of depression and [attention deficit hyperactivity disorder]," she was "perfectly functional" before the accident. The "downward spiral in her health" after the accident was "amply supported by the medical records."

¶ 35    On the question of whether petitioner suffered a loss of consciousness as a result of her fall, there was a conflict between the emergency-department records from Delnor Hospital and petitioner's testimony. But the conflict had been explained, and the arbitrator found the explanation to be credible. Petitioner *inferred*, from what people told her *afterward*, that she must have been unconscious for 45 minutes to an hour. Petitioner "[did] not remember what happened after her fall until she was treated." But fellow workers had told her that she was discovered after 45 minutes. The arbitrator reasoned: "In order to discount the evidence that [petitioner] suffered a [loss of consciousness], one would have to suppose [she] chose to [lie] on an icy, cold parking lot and pretend to [lie] there for 45 minutes until someone, hopefully, would come and discover her." *After* her visit to the emergency department, petitioner learned, from what coworkers told her, that she must have lost consciousness. The arbitrator wrote: "She does not specifically recall a [loss of consciousness]. Her belief that she lost consciousness is honest and based on circumstances of the accident. She does not embellish the facts but plainly explains what she recalls and believes."

¶ 36    Four treating doctors had diagnosed petitioner as suffering from post-concussive syndrome: Dr. Boblick, Dr. Flaster, Dr. Bonesteel, and Dr. Sayyad. Dr. Schneck thought that the post-concussive syndrome might be of a somatization style. Dr. Sayyad found a causal connection between the accident and petitioner's current condition of ill-being because the accident

exacerbated any preexisting psychological problem. On the other hand, the independent medical examiner, Dr. Skaletsky, opined that petitioner's current condition was unrelated to the workplace accident. The arbitrator gave more weight to Dr. Sayyad's testimony than to Dr. Skaletsky's testimony because Dr. Sayyad was board-certified in the treatment of brain injuries and she directed a brain injury program. By comparison, only five percent of Dr. Skaletsky's practice was devoted to the treatment of concussions.

¶ 37   The arbitrator concluded that petitioner was temporarily totally disabled from December 7, 2010, which was the day after the stipulated accidental injuries, until May 31, 2016, the effective date of petitioner's retirement as a school bus driver for respondent: a period of 285 6/7 weeks. See 820 ILCS 305/8(b) (West 2010). The arbitrator further concluded that petitioner had sustained accidental injuries causing a 40% loss of use of her whole person. See *id.* § 8(d)(2).

¶ 38   A majority of the Commission affirmed and adopted the arbitrator's decision, without further discussion.

¶ 39   Commissioner Simpson dissented, "find[ing] the opinions of Dr. Skaletsky more persuasive than those of [p]etitioner's treaters, Dr. Boblick, her primary care physician, and Dr. Sayyad, her physiologist/rehabilitation doctor." All of the neurological and cognitive tests had yielded normal results, and "there were never any objective findings to support [petitioner's] subjective complaints." She did not report any loss of consciousness until about a month after the accident, and her symptomology was inconsistent. Commissioner Simpson wrote:

"During the last examination, [Dr. Skalestsky] noted that [p]etitioner reported a completely different set of symptoms from those she reported in 2011, which he could not attribute to abnormalities in her nervous system. The symptoms that she reported 'did not follow any known neuro pathways.' He noted her various inorganic behaviors and concluded that 'all

of these things combined with objective normal finding, normal deep tendon reflexes, no atrophy, no sensory loss in a neurologic pattern would be inconsistent with any organic or medical' problem. Dr. Skaletsky agreed with Dr. Schneck's diagnosis of somatization disorder."

Commissioner Simpson, therefore, would have terminated the temporary total disability benefits as of August 4, 2011, and would have awarded petitioner only 40 weeks of permanent partial disability benefits, representing a loss of 10% of the person as a whole.

¶ 40    Respondent sought review in the Kane County circuit court, which confirmed the Commission's decision, finding it to be not against the manifest weight of the evidence.

¶ 41    This appeal followed.

¶ 42                                    II. ANALYSIS

¶ 43    Respondent contends that, in two ways, the Commission's decision is against the manifest weight of the evidence: (1) the degree of permanent partial disability that the Commission assigned to petitioner's injuries is excessive, and (2) the award of temporary total disability benefits is excessive.

¶ 44    The Commission may award various types of compensation to a claimant who has sustained some degree of disability from a workplace injury. Under section 8(d)(2) of the Act (820 ILCS 305/8(d)(2) (West 2010)), the Commission may award permanent partial disability benefits on the basis of a "loss of a percentage of the person as a whole." *Ming Auto Body/Ming of Decatur, Inc. v. Industrial Comm'n*, 387 Ill. App. 3d 244, 258 (2008). Claimants are entitled to permanent partial disability benefits if they have sustained "serious and permanent injuries that partially incapacitate [them] from pursuing the usual and customary duties of [their] line of employment or which have otherwise resulted in physical impairment." *Id.*

¶ 45    In *Ming*, the appellate court explains how an award of permanent partial disability benefits is calculated:

"Under section 8(d)2 of the Act, a claimant receives compensation for that percent of 500 weeks that his partial disability bears to his total disability. 820 ILCS 305/8(d)(2) (West 2002). Thus, although [permanent partial disability] benefits are calculated based on the appropriate percentage of 500 weeks that correlates to the claimant's partial disability, a [permanent partial disability] award is designed to compensate a claimant for a permanent disability resulting from a physical impairment and is not premised on a particular number of weeks of incapacity." *Ming*, 387 Ill. App. 3d at 258.

¶ 46    In other words, the number of weeks is merely a variable in a formula that aims to compensate the claimant for an employment-inflicted disability. To apply the formula to the present case, the Commission found that petitioner had "sustained accidental injuries that caused [a] 40% loss of use of her whole person" (to quote from the arbitrator's recommended decision, which a majority of the Commission adopted). Forty percent of 500 weeks was 200 weeks (500 weeks times 0.4). Accordingly, the Commission ordered respondent to "pay [p]etitioner permanent partial disability benefits of $391.93 per week for 200 weeks."

¶ 47    Respondent contends that, instead, the loss of the person as a whole should have been only 10%, as Commissioner Simpson opined in her dissent. That would have made the award of permanent partial disability benefits come to $391.93 per week for only 50 weeks (500 weeks times 0.1).

¶ 48    The other award the amount of which respondent disputes is the temporary total disability benefits. "Temporary total disability is to be awarded for the period of time from when an injury incapacitates an employee to the date the employee's condition has stabilized or the employee has

recovered as far as the character of the injury will permit." *Whitney Productions, Inc. v. Industrial Comm'n*, 274 Ill. App. 3d 28, 30 (1995). The Commission found that petitioner was temporarily totally disabled for a period of 285 6/7 weeks, which was from December 7, 2010, the day after the stipulated workplace injuries, to May 31, 2016, the effective date of petitioner's retirement from her job as a school bus driver for respondent. Thus, pursuant to section 8(b) of the Act (820 ILCS 305/8(b) (West 2010)), the Commission awarded petitioner temporary total disability benefits in the amount of $435.37 per week for 285 6/7 weeks. Respondent maintains, with Commissioner Simpson, that petitioner's post-concussion syndrome was resolved by August 4, 2011, and that petitioner, therefore, was entitled to temporary total disability benefits only for the period of December 7, 2010, to August 4, 2011.

¶ 49    "The time during which a worker is temporarily totally disabled presents a question of fact to be determined by the *** Commission, and the Commission's decision will not be disturbed unless it is against the manifest weight of the evidence." *Archer Daniels Midland Co. v. Industrial Comm'n*, 138 Ill. 2d 107, 118-19 (1990). The same holds true for permanent partial disability. "[T]he Commission's decision regarding the nature and extent of a claimant's disability will not be set aside on review unless it is contrary to the manifest weight of the evidence." *Steak 'n Shake v. Illinois Workers' Compensation Comm'n*, 2016 IL App (3d) 150500WC, ¶ 51. This is a deferential standard of review, not a retrial. See *Shockley v. Industrial Comm'n*, 75 Ill. 2d 189, 193 (1979) (noting that the supreme court's "role is not to discard the findings of the Commission, even though [the supreme court] might have decided differently on the same facts, unless those findings are contrary to the manifest weight of the evidence."). A decision is against the manifest weight of the evidence only if the "clearly evident, plain[,] and indisputable" weight of the

evidence demands the opposite decision. (Internal quotation marks omitted.) *Board of Education, School District No. 90 v. United States Fidelity & Guaranty Co.*, 115 Ill. App. 2d 416, 425 (1969).

¶ 50    For essentially two reasons, respondent maintains that the Commission's decision is against the manifest weight of the evidence.

¶ 51    First, two of petitioner's treating physicians, Dr. Boblick and Dr. Sayyad—both of whom opined that petitioner was still suffering ill effects from her fall at work—had taken petitioner's word that she lost consciousness as a result of her fall. This supposed loss of consciousness was, Dr. Boblick and Dr. Sayyad acknowledged, important to their causation opinions. According to the emergency-department records from Delnor Hospital, however—which Dr. Boblick and Dr. Sayyad could not remember reviewing—petitioner specifically denied to the emergency-department personnel that she had lost consciousness. Respondent asserts that "the [a]rbitrator's attempt to remove the 'smoking gun' and dismiss the history in the [e]mergency [r]oom as false has no support in the record."

¶ 52    But it has support in the record if petitioner's testimony in the arbitration hearing were believed. According to her testimony, her loss of consciousness was a fact that she inferred from what her coworkers told her presumably later on, after she was treated in the emergency department of Delnor Hospital. Originally, petitioner was unaware she had lost consciousness, and, consequently, after she was taken by ambulance from the accident site to Delnor Hospital, she must have denied to the emergency-department personnel that she had lost consciousness. (Petitioner testified she did not remember giving a history in the emergency department.) Later, however, some coworkers told petitioner what had happened. They told her that, after 45 minutes to an hour had elapsed without her making her usual bus stops, they went looking for her and found her lying where she had fallen. It could be that being unconscious made petitioner oblivious to

everything, including the passage of time and unconsciousness itself. It is not inherently implausible that when petitioner fell, her head hit the pavement and literally her next sensory impression was of a coworker crouching over her and asking her if she was all right. If that is what happened, the discrepancy between the emergency-department records and what petitioner told Dr. Boblick a few days later is reasonably explainable: loss of consciousness was a fact that petitioner only was able to infer from what her coworkers told her afterward.

¶ 53    Respondent insists, though, that petitioner's "testimony at trial on this issue was obviously and significantly not credible despite the [a]rbitrator's suggestion to the contrary." In an effort to convince us of petitioner's unbelievability, respondent points out that petitioner contradicted herself on her ability to drive. In March 2011, petitioner reported to Dr. Skaletsky that, since the work-related accident, she had been driving her granddaughter short distances. By contrast, years later, in December 2014, she told Dr. Skaletsky that she had not driven at all since the accident. Likewise, in the arbitration hearing, petitioner testified she had not driven since the accident "because [she had not] trusted [herself]." We acknowledge the contradiction, but "[w]e will not reverse the Commission merely because some evidence incompatible with its finding exists in the record." *Riteway Plumbing v. Industrial Comm'n*, 67 Ill. 2d 404, 409 (1977). A self-contradiction by a witness need not automatically make the witness's entire testimony unbelievable. On the question of petitioner's credibility, we decline to substitute our judgment for that of the Commission. See *id.*

¶ 54    The second reason why, in respondent's view, the Commission's decision is against the manifest weight of the evidence is the lack of any objective evidence that petitioner had anything physically wrong with her. Neither Dr. Flaster nor Dr. Schneck could find any neurological basis for petitioner's complaints, and they concluded, therefore, that petitioner's condition was purely

psychological. "Moreover," respondent notes, "when Dr. Skaletsky reviewed Dr. Schneck's conclusions[,] he *complete*[*ly*] *agreed*." (Emphasis added.)

¶ 55 Therefore, Dr. Skaletsky must have agreed when Dr. Schneck wrote that the work-related accident "might have been the initial trigger for" petitioner's "somatization disorder." See *Mason & Dixon Lines, Inc. v. Industrial Comm'n*, 99 Ill. 2d 174, 182 (1983) (holding that "[a] finding of a causal relation may be based on a medical expert's opinion that an accident 'could have' or 'might have' caused an injury"). There is, in fact, some evidence in the record that post-concussive syndrome *versus* somatization disorder is a false dichotomy. The testimony of Dr. Sayyad, the brain injury expert, could be understood as undermining that dichotomy. She testified that post-concussive syndrome "affects the psychological realm," causing headaches and disturbances in sleep and mood, and that psychological symptoms were "under the umbrella of post-concussion syndrome." Much like Dr. Schneck, Dr. Sayyad opined that, in petitioner's case, post-concussive syndrome "probably exacerbated" a preexisting "psychological impairment." See *Sisbro, Inc. v. Industrial Comm'n*, 207 Ill. 2d 193, 205 (2003) (holding that "[a]ccidental injury need not be the sole causative factor, nor even the primary causative factor, as long as it was *a* causative factor in the resulting condition of ill-being" (emphasis in original)).

¶ 56 After all, respondent insists that petitioner has a "psychiatric disorder." "It is *** well[-]established that a psychological injury is compensable if it results from an accidental injury." *BMS Catastrophe v. Industrial Comm'n*, 245 Ill. App. 3d 359, 365 (1993).

¶ 57 Take *BMS*, for example. In that case, the employee fell and struck her head at work. *Id.* at 361. Over the following two years and eight months, the employee, who previously was in good health (*id.* at 365), complained of a variety of accumulating symptoms: headaches, sensitivity to light and noise, dizziness, problems with balance, impaired judgment, neck and back pain, muscle

spasms, numbness in the extremities, and forgetfulness (*id.* at 361-63). Several diagnoses were made, but, ultimately, "[n]o reports *** established an organic basis for [the employee's] physical complaints." *Id.* at 365. "After running a[n] MRI to rule out gross structural injury to the brain," a psychiatrist diagnosed "somatization disorder, a chronic condition in which a person has pain and a preoccupation with pain and bodily symptoms far in excess of any known organic pathology." *Id.* at 364. The psychiatrist did not believe that the employee "was malingering." *Id.* He believed, rather, that the employee "truly was in pain based upon her reports of pain, her appearance of considerable discomfort, her difficulty concentrating[,] and her restricted movement." *Id.* In other words, the employee was not faking it: she had a real mental illness, somatization disorder. The psychiatrist opined that the employee's somatization disorder was causally related to the work-related accident "because she exhibited no pattern of similar symptoms in the past and because there was no other plausible source of such stress." *Id.* at 364-65. The Commission agreed, awarding benefits to the employee, and the employer appealed. *Id.* at 360. On the following reasoning, the appellate court found the Commission's decision to be not against the manifest weight of the evidence:

> "A causal connection between a condition of ill-being and a work-related accident can be established by showing a chain of events wherein an employee has a history of prior good health, and, following a work-related accident, the employee is unable to carry out his duties because of a physical or mental condition." *Id.* at 365.

¶ 58 Petitioner is comparable to the employee in *BMS*. Before her fall at work, petitioner was fully functional. Now she is preoccupied with debilitating symptoms. Several experts, including a psychologist, have diagnosed petitioner as having somatization disorder. Even Skaletsky, the independent medical examiner, agrees with that diagnosis, and he agrees with Schneck that the

work-related injury could have triggered the somatization disorder. Petitioner did not have this psychological disorder before falling at work and hitting her head. For years previously, she performed her duties as a school bus driver without any apparent difficulty. Now she uses a walker and complains of unremitting headaches. If, indeed, as Schneck and Skaletsky have concluded, petitioner has somatization disorder, her debilitating pain is, by definition, real instead of feigned.

¶ 59    The "estimation of partial loss is peculiarly the function of the Commission," and such an estimation is "not capable of a mathematically precise determination." *Steak 'n Shake*, 2016 IL App (3d) 150500WC, ¶ 51. A 40% loss of the person as a whole does not seem unreasonable in petitioner's case. The circuit court was correct: the Commission's decision is not against the manifest weight of the evidence.

¶ 60                              III. CONCLUSION

¶ 61    For the foregoing reasons, we affirm the circuit court's judgment, which confirmed the Commission's decision.

¶ 62    Affirmed.